UNITED STATES of America,

v.

Frank GANGI, Defendant.

No. CR 90–0424 (RR).

United States District Court,
E.D. New York.

March 27, 1995.

Zachary W. Carter, U.S. Atty., E.D.N.Y., Brooklyn, NY, by Elisa Liang and Mark Cohen, Asst. U.S. Attys., for the U.S.

The Legal Aid Soc., New York City by Thomas Concannon and Mark B. Gombiner, for defendant.

## MEMORANDUM AND ORDER

RAGGI, District Judge:

On October 31, 1990, Frank Gangi pleaded guilty before this court to racketeering and drug trafficking. On February 26, 1993 he was sentenced to ten-years' incarceration, a significant departure from his guideline range of life imprisonment. The departure was made possible by Gangi's substantial assistance to the United States in various criminal prosecutions. U.S.S.G. § 5K1.1. On January 31, 1994, the United States moved for further reduction in Gangi's sentence pursuant to Rule 35(b) of the Federal Rules of Criminal Procedure.[1] The court denied the motion the same day it was filed without inviting a response from the defendant.

Gangi appealed, his counsel arguing that the court's denial violated Rule 35(b), deprived him of due process, and constituted an abuse of discretion. The Court of Appeals remanded the case directing that Gangi be afforded an opportunity to respond directly to the government's motion for reduction of sentence. *United States v. Gangi*, 45 F.3d 28 (2d Cir.1995). This court has complied with the Circuit's directive. Having given careful consideration to all submissions, including those of the defendant, it concludes that no further reduction of sentence is warranted. The court bases this decision on the totality of circumstances involving Gangi and his crimes of conviction.

### 1. The Crimes of Conviction

Frank Gangi was a professional criminal for most of his adult life. At his guilty plea, he admitted being a member of an organized crime racketeering enterprise known as the "Pitera Crew," a vicious arm of the Bonanno Organized Crime Family. Indeed, Gangi was a close confidante and confederate of the crew leader, Thomas Pitera.

During the period between 1987 and January 1989, Gangi and Pitera routinely earned money by dealing in cocaine. Indeed, during those years they distributed approximately fifty kilograms of cocaine.

At his plea allocution, and again at the trial of Thomas Pitera, Gangi admitted direct involvement in horrific crimes of violence, specifically the murders of Talal Siksik, Phyllis Burdi, Marek Kucharsky, Joseph Balzano, and Andrew Jakakas. The calculating and depraved manner in which Gangi, Pitera, and other confederates committed these murders and then disposed of the victims' bodies must be noted, even if only briefly.[2]

---

1. Rule 35(b) states:

    The court, on motion of the Government made within one year after the imposition of the sentence, may reduce a sentence to reflect a defendant's subsequent, substantial assistance in the investigation or prosecution of another person who has committed an offense, in accordance with the guidelines and policy statements issued by the Sentencing Commission pursuant to section 9494 of title 28, United States Code. The court may consider a government motion to reduce a sentence made

    one year or more after imposition of the sentence where the defendant's substantial assistance involves information or evidence not known by the defendant until one year or more after imposition of sentence.

2. The court limits its discussion to the five murders that were the racketeering acts pleaded to by Mr. Gangi. Pitera, whether by himself or with others, was involved in far more homicides. *See United States v. Pitera*, 5 F.3d 624 (2d Cir. 1993).

For example, Talal Siksik, a drug dealer, was shot to death at point blank range by Pitera in a Brooklyn apartment because he was thought to be a police informant. Gangi accompanied Pitera to the apartment knowing that Siksik would be killed there. Indeed, en route to the apartment, Gangi stopped with Pitera at the home of another crew member, Richard David, and there picked up the gun and silencer that would be used in the murder, as well as a hacksaw, plastic bags, and a suitcase for later disposal of the body.

Phyllis Burdi, a drug addict, was shot at point blank range by Pitera because he held her responsible for the death of his wife from a drug overdose. Although she had been hiding from Pitera, it was Gangi who located her and kept her at a particular site so that Pitera could come and kill her.

Marek Kucharsky, another criminal, was stabbed by Pitera and his throat slit by Gangi as the result of a petty dispute during which Gangi perceived Kucharsky to have insulted Pitera.

After each of these murders, the victims' bodies were stripped of any jewelry and put into a bathtub. There they were cut into pieces with a hacksaw. Gangi participated directly in this butchery. When the bloody business was done, the body parts were transported, usually in suitcases, to a bird sanctuary on Staten Island and buried randomly throughout the site.

Joseph Balzano, a crew member, was killed when Pitera lost trust in him. Pitera and Gangi pretended they were taking him out to dinner to discuss various problems. Instead Gangi stabbed Balzano with an ice pick, whereupon Pitera shot him in the back of the head and slit his throat. Balzano's body was dumped in an alley near a gas station.

Pitera planned to torture and kill Andrew Jakakas because of Jakakas' insulting behavior toward himself and other organized crime members. Gangi, a close friend of Jakakas, decided to kill him first, purportedly to spare

him Pitera's torture. Gangi and a confederate took Jakakas for a drive whereupon the confederate shot Jakakas in the back of the head. His body was left in a vacant lot in Brooklyn.

The Sentencing Guidelines applicable to the conduct just described yielded a total offense level for Frank Gangi of 44, a level so high as to be "off the chart." Moreover, because of Gangi's extensive criminal record, the guidelines assigned him 27 criminal history points. Anything over 12 points yields a criminal history category of VI, the highest category recognized by the Sentencing Commission. The combination of these factors resulted in a guideline range offering no flexibility. Gangi faced a sentence of life imprisonment.[3]

## 2. Gangi's Cooperation with Authorities

In fact, the court was not obliged to impose a lifetime prison sentence on Gangi because his substantial assistance to the government prompted a downward departure motion pursuant to U.S.S.G. § 5K1.1. The court granted this application. Because factors relevant to the original sentencing departure bear on the present decision not to grant any further reduction, the court outlines them briefly here.

Frank Gangi began cooperating with the authorities some six months before his guilty plea. In April 1990, when he was stopped by New York City police officers for a traffic violation, Gangi asked to speak to a homicide detective and voluntarily confessed the brutal crimes in which he had participated. Whether Gangi's extraordinary confession was prompted by the mental torture of his own conscience (which this court believes to be genuine), or the suspicion that federal authorities were closing in on their investigation of Pitera and his crew (which was also true), or some combination thereof (which seems likely), the court cannot say with certainty. But there can be no doubt that Gangi's full and complete cooperation with the

---

**3.** In prosecuting Pitera for his homicidal acts, the government sought an even more severe sentence: death. *See* 21 U.S.C. § 848(e)(1)(A). Although a jury did find Pitera guilty of the capital count, as well as numerous other counts charged in his indictment, it could not reach a unanimous decision as to the death penalty. Accordingly, this court sentenced Pitera to life imprisonment. *See United States v. Pitera,* 5 F.3d at 626.

authorities from the moment of his traffic arrest was invaluable to the United States Attorney in the successful prosecution of Pitera and his crew. But for Gangi, federal authorities might never have learned the terrible scope of Thomas Pitera's depraved criminal activities. It was Gangi who told them of the numerous bodies buried in the Staten Island bird sanctuary and who made possible the exhumations which provided devastating evidence against Pitera. Gangi's testimony at the Pitera trial—detailed, candid, and courageous—was crucial to that conviction. His subsequent testimony against Vincent Giattino was similarly valuable, as was that of his wife, who also testified for the prosecution against Giattino, at no small risk to herself and her children. Gangi's willingness to testify against various other members of the Pitera Crew was an important factor leading to their guilty pleas.

### 3. *Gangi's Sentencing*

This court gave careful consideration to Gangi's sentence. Viewed in isolation, the crimes of conviction fully warranted a sentence of life imprisonment. But, as the court noted at the time of sentence, Gangi's "cooperation [was] extraordinary, more than any other person who's ever appeared before me." Indeed, that statement remains true two years later. The court has never had before it a defendant whose candor about his own criminal conduct and whose cooperation in the prosecution of others was as full and complete as that of Frank Gangi.

This court's purpose in originally sentencing Frank Gangi was to impose a term of incarceration that gave him the maximum consideration for his assistance without trivializing his own horrible crimes. Toward this end, the court imposed a ten-year term of imprisonment, a considerable departure from the lifetime incarceration mandated by the guidelines. Mindful that Gangi—and perhaps even the prosecutor who spoke on his behalf—had hoped for more leniency, the court noted that the ten-year sentence could be viewed as one requiring Gangi to serve only two years in jail for each of the lives he had taken—a light sentence indeed.

### 4. *The Initial Ruling on the Rule 35(b) Motion*

It was this court that, at sentencing, first discussed the possibility that a Rule 35(b) application might be made. It stated:

> I think that I have given Mr. Gangi a sentence that recognizes his full and complete cooperation, on the other hand, I do not wish to preclude the government from bringing anything else to my attention in the course of the one year period, if there [is] more, I'm not saying it would have an effect, but I'm not foreclosing it either.

This statement was not intended to encourage a Rule 35(b) motion or to raise any false hopes. Indeed, precisely because the court did give Gangi the maximum credit it thought just for his extraordinary cooperation at his initial sentencing, it was of the view that any further reduction would be difficult to justify. The Court of Appeals acknowledged this problem in remanding the case:

> [I]t is difficult in a case such as this, where the defendant has received a 10–year sentence for confessed crimes that include participation in five murders, to conceive of any level of cooperation that might lead to a more lenient sentence.

*United States v. Gangi*, 45 F.3d at 32. Nevertheless, this court was prepared to keep an open mind.

Since the imposition of sentence, Gangi has routinely corresponded with the court on a *pro se* basis, raising various concerns about the terms of his incarceration, the treatment of his family, and the government's obligations under his plea agreement. Sometimes these letters have moved for particular relief. Other times, they have informally expressed Mr. Gangi's frustration with his situation. This court has always responded, even if only to tell Gangi that it was not empowered to address a particular problem of concern to him. Apparently, this history of correspondence, which has afforded the defendant an ongoing opportunity to convey his views to the court, was not revealed to the Court of Appeals. Yet, it is in the context of such frequent, if not routine, communication that the government's Rule 35(b)

motion—and this court's failure to ask Gangi for a response—must be viewed.

In moving for a further sentencing reduction pursuant to Rule 35(b), the prosecution urged the court to consider two factors: (1) Gangi's assistance, since sentencing, in investigations involving four individuals whom he had known during his years of criminal activity, and (2) the personal hardships experienced by Gangi and his family while in the Witness Protection Program.

The latter problem had been touched on at the initial sentence, at which time this court expressed concern that more was not being done for Gangi's wife. In subsequent letters to the court, Gangi conveyed in detail his anxiety over these matters. For example, in a letter dated June 3, 1993, Gangi expressed dismay that the Marshals Service was about to terminate support payments for his wife thereby leaving her dependent on public assistance. He stated:

> I am at wits end your honor and don't know what to do. I was led to believe that [my wife] would be taken care of as long as I was incarcerated and so was she.

> The problem is stemming from a suggestion the Marshalls made to [my wife] to study for a G.E.D. test. [She] did not feel, with the ... young children that she could successfully study and pass the test, so she refused. So they claim now that they tried to make her self sufficient and she refused.

> Your Honor if there is anything you can do to help me, I'd be so grateful, and if not, I will understand.[4]

As if this court would not fully appreciate his anguish and frustration from these statements alone, Gangi added a postscript:

> I called the [Witness Protection] spokeswoman in Washington, and she ... suggested to me [that my wife] sign out of the program so at least I will be able to get visits. This is the reply I got.

The absurdity of the last suggestion was not lost on the court, which well appreciated that Gangi's wife could not sign herself out of the Witness Protection Program without real and serious risk to herself and her children. Plainly, this court lacked authority to enter orders regarding the administration of the Witness Protection Program and communicated that to Gangi on June 7, 1993. But not being totally ignorant of the by-ways within the executive branch around the program's bureaucratic red tape, the court directed the U.S. Attorney's office to make appropriate inquiries in an effort to resolve Gangi's problems.

Thus, if the court did not ask Gangi whether he wished to respond to that part of the government's Rule 35(b) motion citing the domestic difficulties he had encountered in the Witness Protection Program, it is because the defendant had already provided the court with a stark and all-too-clear picture.

As to the government's description of Gangi's continued cooperation, the court had no reason to suspect that it underrepresented the extent of his assistance. *See United States v. Gangi*, 45 F.3d at 29. To the contrary, the court was aware that, in this case, some of the Assistant U.S. Attorneys who had worked with Gangi thought the court's ten-year sentence was too severe and, thus, could be expected to present any and all evidence conceivably supportive of a Rule 35 reduction.

The Court of Appeals' decision now makes plain that it was nevertheless error for this court to rule on the motion without first inviting a direct response from Gangi. This court has, of course, endeavored to correct the error. But it cites to one further piece of correspondence from Gangi that appears relevant. On February 10, 1994, less than two weeks after the court's denial of the Rule 35(b) motion, Gangi again wrote to the court. He did not complain that he had not been heard on the motion. Instead he stated simply:

> I would like to express my thanks for the timeliness exercised in the decision regarding the Rule 35 motion submitted on my behalf. I am very saddened by your deci-

---

**4.** Certain correspondence between Gangi and the court has been sealed to prevent personal disclosures that could jeopardize him or his family. The court unseals those portions of the correspondence referred to in this opinion, and redacts even these excerpts as appropriate to ensure the safety of these individuals.

sion, but I guess I must be punished for my past action.[5]

Before discussing the now-supplemented record, the court briefly outlines the reasons for its original denial of the Rule 35 motion. The court was unwilling to reduce Gangi's sentence for further cooperation as to four individuals with whom he had had past contact for the simple reason that it viewed this assistance as part and parcel of the "full and complete" cooperation already factored into the original departure. That the prosecution may not have fully debriefed Gangi as to his knowledge of these individuals and their past events at the time of the original sentencing was irrelevant. The court had assumed in imposing sentence that Gangi had told—and would continue to tell—prosecutors everything he knew of past criminal activity by others. It gave him full credit for such cooperation in his original sentence.

As to the hardships of protective custody on both Gangi and his family, this court has always been sympathetic, but it did not consider these hardships an appropriate ground for a further reduction in sentence, particularly since the described difficulties were within the control of the Attorney General. Thus, in denying the Rule 35 motion, the court stated:

> The court recognizes Mr. Gangi's extraordinary cooperation. But his own criminal conduct was too serious to permit a sentence of less than ten years. The court

remains of that view. To the extent that incarceration as a protected witness deprives Mr. Gangi of the opportunity to visit with his family, the problem is properly addressed by the executive branch, which sets the limits raised here.

### 5. *Gangi's Pro Se Application for Reconsideration*

In pursuing an appeal from this court's denial of the Rule 35 motion, neither the Legal Aid Society, which represented Gangi, nor the U.S. Attorney's office advised the Second Circuit that this court had indeed heard from and responded directly to Gangi in connection with the Rule 35 motion. Concededly, this exchange took place in the context of an application for reconsideration. But certainly, when a denial of due process is being asserted on appeal, the defense, no less than the government, might well be expected to disclose to the Circuit the fact that its client had indeed communicated to the district court his own reasons in support of a further sentencing reduction and had received a detailed response. This court here sets forth the facts pertinent to this exchange.

By letter dated September 26, 1994, Gangi asked this court to reconsider its denial of the Rule 35 motion, citing two grounds in support of a further reduction: (1) lesser sentences imposed on cooperating defendants

**5.** The letter then pleads for the court's assistance, not in reducing Gangi's sentence, but in getting the executive branch to meet its obligations to his family in the Witness Protection Program. Only a few excerpts need be cited to convey Gangi's desperation:

> I asked for only a few things in return for my cooperation, two of these were that my wife and children be taken care of during my incarceration and that the burden of supplying money for my necessities not fall on her shoulders. Neither of these two things are being taken care of.

> Your Honor, I would never have brought my wife into this nor agreed to her endangering herself and the children if I thought for one minute that the government would not fulfill it's obligations to my family and myself.

> Due to all of the pressure forced on my wife, left to fend for herself, reduced to the role of

welfare recipient and the remaining time on my sentence it is beginning to look like I will not have a family to return to. I know that if the government would make a concerted effort to fulfill it's obligations both written and verbal to both myself and my wife it would go a long way to relieve a lot of the unnecessary pressure placed on my wife. If only we would be afforded a chance to visit with each other it could make a difference.

> My only hope is that you will be compassionate enough to force a resolve in this terrible injustice.

The court responded on February 24, 1994, advising Mr. Gangi that, although it sympathized with his concerns, the judiciary could not resolve his problems. "The protection of federal witnesses and their families is exclusively the duty of the executive branch." Once again, the court directed the United States Attorney to respond to Gangi's concerns.

in other cases, some of whom had admitted involvement in even more homicides than Gangi; and (2) the sentence imposed by this court on Gangi's co-defendant, Richard David.

At the time this letter was received, this court was not aware that notice of appeal from denial of the Rule 35 motion had been filed on Gangi's behalf by the Legal Aid Society. Thus, thinking that it had jurisdiction to entertain Gangi's motion for reconsideration, the court issued an opinion on October 4, 1994, addressing not simply the technical propriety of reconsideration, but the actual merits of Gangi's arguments, which were, after all, different from those cited by the government in its original motion papers.

The court explained in detail to Gangi its reasons for denying him a further reduction in sentence:

As to the first factor, this court notes that any sentence requires a judge carefully to consider all relevant facts about a defendant and the crime he has committed. Superficial similarities among cases may not survive in-depth consideration of the facts. This court simply cannot compare Mr. Gangi's sentence with that imposed on defendants in other cases with which it is not fully familiar. This court can only assure Mr. Gangi that it has given careful individual consideration to his sentence, weighing the heinousness of his crimes along with the vital cooperation he gave the government and the impact of his incarceration on his family. It remains convinced that the sentence imposed is the appropriate one in this case.

Co-defendant Richard David was sentenced to a twenty-year term of incarceration pursuant to a plea bargain with the United States whereby he admitted homicidal involvement in the same racketeering enterprise participated in by Mr. Gangi. He chose not to cooperate with the government. Indeed, there was nothing that mitigated this former court officer's base involvement in crime. Because Mr. David's plea was structured to admit involvement in the racketeering enterprise at an earlier time than Mr. Gangi, the maximum sentence provided by law was twenty years in prison, rather than the lifetime incarceration faced by Mr. Gangi under subsequent amendment of the law. Moreover, because the date of Mr. David's crime preceded the enactment of the Sentencing Guidelines, he will be eligible for parole, whereas Mr. Gangi will not. In short, absent extraordinary circumstances, Mr. David will be released after serving two-thirds of his sentence, making his time in jail only a few years longer than Mr. Gangi's.

At the time Mr. David pleaded guilty, this court was not fully aware of the scope of his criminal conduct. Once the full facts were known, the court declined to accept the original plea agreement. Mr. David subsequently pleaded guilty to an additional charge permitting this court to impose a lifetime term of special parole, the practical effect of which was to expose Mr. David to lifetime incarceration if, after release from prison, he at any time violated any term of his parole. Mr. David subsequently challenged his conviction on appeal, arguing that this court could not reject a previously-accepted guilty plea. In fact, the matter was remanded to this court to deal with a more technical flaw in the plea. But the order of the Circuit Court, in light of concessions made by the prosecutor, strongly suggested that this court should not persist in rejecting Mr. David's original plea agreement. In resentencing Mr. David to the maximum twenty-year term under the original plea, this court recently made plain to him that his "bargain" is more generous than his crimes deserve, and that, had the court known all the facts, the plea would never have been accepted.

That having been said, this court is not persuaded to reduce Mr. Gangi's sentence any further. As noted, Mr. Gangi's sentence was fixed only after this court carefully reviewed all relevant facts about him and his crime. Although justice might indeed support a higher sentence for Mr. David, it does not warrant a lesser sentence for Mr. Gangi.

By letter dated October 25, 1994, Mark Gombiner, Gangi's appellate counsel, advised this court of the pending appeal from the

original denial of the Rule 35 motion, and submitted that the district court was, therefore, without jurisdiction to rule on the *pro se* motion for reconsideration. In an order dated November 2, 1994, this court noted some confusion as to Gangi's intent:

> What is not clear from Mr. Gombiner's letter is whether his client, Mr. Gangi, himself wishes to withdraw his appeal while this court formally considers his motion for reconsideration, thereby permitting the Circuit to entertain in one argument all factors relevant to [denial of] the Rule 35 motion; or whether Mr. Gangi is pursuing his appeal and formally withdrawing his motion for reconsideration before this court; or whether Mr. Gangi is pursuing his appeal and asking that his September 26, 1994 letter be treated only as informal correspondence with the court.

Although the first scenario was plainly the most sensible and, certainly, the most efficient use of judicial resources, this court suspected that defense counsel was not particularly interested in the Court of Appeals seeing the court's detailed response to Gangi's own submission.[6] Thus, recognizing its lack of jurisdiction, the court vacated its October 4, 1994 "order," and docketed Gangi's September 26, 1994 letter and the court's response as "informal" correspondence.

### 6. *Consideration of the Motion on Remand*

██ Upon receipt of the Circuit mandate, this court held a status conference to set a schedule for the filing of further submissions. Although the remand directed simply that the defendant be afforded the opportunity to respond to the government's motion, this court thought it best to invite new submissions from both sides to ensure careful consideration of all relevant facts. The court also re-read Gangi's entire sentencing file, including the original Probation Department pre-sentence report and all submissions in support of the original § 5K1.1 application. It reviewed Gangi's correspondence with the court in the years between sentence and remand. After receiving the new submissions of the parties, the court heard orally from counsel. It did not, however, accede to the defense request that it order the Marshals to produce Gangi and his wife so that they could address the court directly. This was unnecessary because the court accepts as true all representations made by defense counsel as to the domestic difficulties encountered by Gangi and his family while in the Witness Protection Program. *See United States v. Gangi*, 45 F.3d at 32 (leaving decision as to whether or not to hold hearing to discretion of district court).

The court now turns to the arguments advanced in support of the Rule 35 motion. The government, in a letter dated February 13, 1995, simply repeats the assistance given by Gangi in the four investigations referred to in its initial papers. The defense, in its letter dated February 24, 1995, emphasizes the purported rank of the targets within their respective criminal spheres and notes that Gangi's assistance included grand jury testimony, F.B.I. debriefings, and meetings with state, as well as federal, prosecutors. It further urges the court to consider that Gangi's continued cooperation was rendered despite his increased dissatisfaction with the treatment he and his family have received in protective custody, and at some additional risk to all of them. Finally, the defense asks the court to consider the possibility that denial of the motion would discourage others convicted of heinous crimes from continuing cooperation after sentencing.

The court remains unpersuaded that Gangi's assistance to the government since the original sentencing warrants any further reduction in his sentence. This decision is not meant to denigrate the importance of Gangi's assistance, nor the risk in providing it, both of which the court fully appreciates. Neither is it intended to discourage Gangi or others from rendering continued cooperation after sentence. But this court considers Gangi's original ten-year sentence to be a very substantial departure from the guideline range applicable to his crimes. When this court

---

**6.** On remand, defense counsel explained that he did not advise the Court of Appeals of the proceedings on his client's motion for reconsideration because he did not wish to expose this court to further criticism for actions taken without jurisdiction. Appellate counsel should not have troubled himself with "protecting" this court from possible criticism.

departed from life imprisonment to ten years, it focused on Gangi as a discrete and, indeed, unique individual. It was at that time convinced that his cooperation was not merely opportunistic, as is so often the case with cooperators, but based on genuine remorse and, indeed, shame for his life of crime. That was why the cooperation was, from its inception, full and complete, and not presented to the prosecutors piecemeal or with strings attached. Thus, the court sentenced Gangi assuming that he had told—and would continue to tell—appropriate authorities everything he knew of past criminal conduct. The court emphasizes again: the original sentence was intended to give Gangi *maximum* consideration for full and complete cooperation on all past criminal activities. Justice is not served by further reducing a sentence that has already taken such extraordinary conduct fully into account.

In its letter, the defense also details the adverse effects cooperation has had on Gangi and his family. Numerous documents relevant to this point are attached. In essence, the problems are (1) that, as a result of budget difficulties, the U.S. Marshals Service has cancelled all family visits for prisoners and family in protective custody, thereby preventing Gangi and his family from seeing each other once or twice a year as originally expected; (2) that Gangi's wife, who cares for young children, has been terminated from funding by the Marshals Service for failure to obtain either her high school equivalency diploma or a job, and, as a result, is endeavoring to support herself and her children on $1,000 a month in public assistance benefits; and (3) that because Gangi is in protective custody, he has not had the same opportunities to earn money for his family as prisoners in general population who could seek to participate in UNICOR programs, or who could work with private authors on books.[7]

■ It is appropriate to consider any adverse effects suffered by a defendant and his family as a result of substantial assistance to the government in ruling on an application for a reduction in sentence. *United States v. Gangi*, 45 F.3d at 31. But the effects that generally concern a court most are those outside threats posing a "danger or risk of injury to the defendant or his family resulting from his assistance." *See* U.S.S.G. § 5K1.1(a)(4); *see also United States v. Agu*, 949 F.2d 63, 66 (2d Cir.1991), *cert denied*, 504 U.S. 942, 112 S.Ct. 2279, 119 L.Ed.2d 205 (1992). For example, in *United States v. Lara*, 905 F.2d 599 (2d Cir.1990), a case cited by the defense, a court downwardly departed from the sentencing guidelines because of its concern that a defendant would be a likely target for prison violence and could not adequately be protected by the government.

■ But this case is not at all akin to *Lara*. Nothing before this court suggests that the United States is not adequately protecting Gangi and his family from threats of violence or harm attributable to those against whom he cooperated. The adverse effects of cooperation cited by the defense all relate to perceived deficiencies in the Witness Protection Program's handling of Gangi's domestic situation. While the court continues to be sympathetic to these concerns, they are not of the same magnitude as threats of death or violence. The propriety of dealing with such matters through a reduction in sentence seems highly questionable.

The Witness Protection Program is, after all, administered by the United States Marshals Service, an agency answerable to the Attorney General, in whose custody Gangi has been placed. The United States Attorney, the movant in this action, has direct access to the Attorney General. Yet, at oral argument, this court was advised that the United States Attorney for this district has never directly communicated concerns about Gangi's situation to the Attorney General nor sought her intervention. This task has been left to subordinates, or to Gangi himself, who have received little assistance. This scenario is perplexing. Everyone before the court concedes that Gangi's cooperation was extraordinary, and that his treatment and that of his family while in protective custody has been problematic, if not insensitive. Certainly, justice is best served by having these

---

7. Counsel submits that Gangi's opportunity to earn a $35,000 book advance was lost when he was denied even telephone access to a co-author as a result of his protected status.

domestic concerns dealt with directly and, if necessary, at high levels within the Department of Justice before court action is sought, particularly action that would reduce a criminal sentence for multiple murders.[8]

This court's task is not to administer the Witness Protection Program or to deal with its budgetary and bureaucratic problems. This court's task is to fashion a sentence that is fair to Frank Gangi, to the victims of his crimes, and to the public at large in light of all relevant circumstances. Unquestionably, Gangi has rendered, and continues to render, significant cooperation to the United States in its investigation and prosecution of individuals with whom he came into contact in his life of crime. He deserves credit for these efforts. His cooperation has put him and his family at significant risk, requiring their placement in protective custody, action which has split them from one another and worked real emotional and financial hardships. This is properly considered in fixing sentence and in ruling on a motion for reduction. But the court returns, as it must, to the crimes of conviction, heinous acts for which society's total intolerance must be expressed. The court remains convinced that a ten-year term of incarceration gives Gangi full consideration for his cooperation and its consequences, while imposing that punishment for his crimes necessary to do justice in the case.

*Conclusion*

The motion for a reduction of sentence is denied.

*SO ORDERED.*

---

8. Indeed, the court had thought that the United States Attorney had resolved these matters informally. On April 1, 1994, Mr. Gangi moved before this court for specific performance of his cooperation agreement, most particularly insofar as it affected his family. The court directed the Clerk to docket this submission as a *pro se* civil complaint for enforcement of a contract. *Gangi v. Gangi v. Kings County District Attorney, et al.,* 94 CV 2594. Before directing service, however, the court ordered the United States Attorney's office to endeavor to resolve the dispute without litigation. When Mr. Gangi withdrew the action on July 19, 1994, the court assumed a satisfactory resolution had been achieved.